**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Docket No. 18 CR 873 |
| vs. | ) | |
| MATTHEW GREGORY BERGER, Defendant. | ) | Chicago, Illinois<br>January 11, 2019<br>11:24 o'clock a.m. |

TRANSCRIPT OF PROCEEDINGS - DETENTION HEARING
BEFORE THE HONORABLE MARY M. ROWLAND, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: HON. JOHN R. LAUSCH, JR.
United States Attorney
BY: MS. KAITLIN G. KLAMANN
219 S. Dearborn St., Suite 500
Chicago, Illinois 60604

For the Defendant: MOTTA & MOTTA LLC
BY: MS. ALISON H. MOTTA
1700 N. Farnsworth Avenue, Suite 12
Aurora, Illinois 60505

Transcriber: MS. JOENE HANHARDT
Official Court Reporter
219 S. Dearborn Street, Suite 1744-A
Chicago, Illinois 60604
(312) 435-6874

* * * * * * * * * * * * * * * * * *

PROCEEDINGS RECORDED BY
DIGITAL RECORDING
TRANSCRIPT PRODUCED BY COMPUTER

***** PLEASE NOTIFY OF CORRECT SPEAKER IDENTIFICATION *****

**NOTE: FAILURE TO STAND NEAR THE MICROPHONE MAKES PORTIONS UNINTELLIGIBLE AND INAUDIBLE**

THE CLERK: 18 CR 873, USA vs. Berger.

THE COURT: Good morning.

MS. MOTTA: Good morning, your Honor, Alison Motta on behalf of the defendant.

MS. KLAMANN: Good morning, your Honor, Kaitlin Klamann on behalf of the United States.

MS. MOTTA: And, your Honor, I apologize for two things. One, my being late this morning. The judge at 26th and Cal took the bench forty-five minutes after the court call.

And I greatly apologize. I was under the impression that Mr. White, I assumed, was Pretrial Services when I was -- I would have never made the same -- expressed my opinion in the same manner as I would to Pretrial Services, as I would to the Court.

THE COURT: Okay.

MS. MOTTA: So, I apologize for that, Judge.

THE COURT: Well, it's -- I understand that you called yesterday.

So, a couple of things.

So, I have a lot of things in my inbox that I need to somehow get in the record, because I don't want them in my inbox.

I mean, I don't care that they are in my inbox, but they need to get in the record.

First of all, I -- the case has been indicted. So,

that means the case has been assigned to Judge Durkin.

He has a standing order, which some district judges do, to refer arraignments and bond determinations to magistrate judges. Okay?

And Mr. Berger has been bounced around a little bit already. So, I would like to quit the bouncing.

The assigned magistrate judge to the case, which is a random thing that happens, is Judge Gilbert. Okay?

So, the arraignment actually is set -- I don't know if you have gotten notice of this -- for Monday at -- in front of Judge Gilbert. Okay?

So, theoretically, Judge Gilbert would have the detention hearing with the arraignment -- you know, when he has -- when he has -- the arraignment. Okay?

That seemed insane to me because we have already dragged Mr. Berger this far. So, this is why I kept today's hearing.

But I don't get any notices of what is happening on the docket, because I am not assigned to the docket. So, you know, the computer doesn't talk to me about the case.

So, when I just looked at it this morning, to pull up the indictment -- because I hadn't seen it -- and I see that you asked for more time.

Now, that was on Wednesday.

So, my first question is would you like more time,

because you are going to see Gilbert, anyway.

MS. MOTTA: I do not need more time --

THE COURT: Okay.

MS. MOTTA: -- for the purposes of detention.

THE COURT: So, I am going to deny that motion without prejudice, you know.

Okay. So -- because you are going into court with Gilbert, anyway. So, I want to just take care of that.

What I want to say about all of the e-mails is I think if you could both just take care of, kind of, doing one detention hearing filing and just getting things on the record after today.

I know that Judge Finnegan -- because we have so many judges here -- asked you for certain things. So, I understand that is how it got going.

So, I am not mad at you. And I think that occurred maybe because it was a holiday or she was looking for things in a timely fashion, or whatever. So, she kind of got things going. So, that is how that got rolling.

But these things do need to be in the record, particularly because now I have looked at them. And anything the Court looks at is supposed to be in the record.

The only thing I would be cautious about is, of course, you sent me medical records. And those should not be filed publicly. You are supposed to file those under seal.

MS. MOTTA: I did file those under seal.

THE COURT: You did already? Okay. Great.

So, that is taken care of.

So, just -- they don't have to be fancy. Just, like, a one-page, "Government's Filings Re: Detention."

"Defendant's Filing Re: Detention."

I mean, really, that is all it has to be. And, then, everything will be in there.

Okay. With that, so, I have looked at everything. So, everyone knows that.

And we have all -- everybody has gotten a copy of the Pretrial Services' report, I assume?

MS. KLAMANN: Yes, your Honor.

MS. MOTTA: Yes, your Honor.

THE COURT: Okay.

Any changes needs to happen.

Any changes, corrections, I need to know about that.

MS. KLAMANN: Not from the government, your Honor.

MS. MOTTA: And the defense has just taken a look at this now.

However, the first thing that I noticed right off is that there is a reference to a no-bond warrant from 2007. And I think that that was, when we look at the reports, it was an actual -- there was a bond set on it. He posted bond in that case.

One minute. Let me look at the report.

THE COURT: Where is my Pretrial report?

(Brief pause.)

MS. MOTTA: It is a prior bond forfeiture warrant.

(Brief pause.)

MS. MOTTA: So, there was just, from 2007, it was -- he did -- he was arrested and he posted bond.

And there may have been an I-Bond, but he never had a failure to appear, other than he did miss court when he was in this -- when he was in federal custody -- recently. But I have already gotten that warrant quashed in Cook County.

THE COURT: I don't think a 2007 warrant is the issue here. So, I am not worried about that.

Okay. So, I also want to let you know, because I am not used to kicking cases around, I did not -- I did read a copy of the transcript.

It is rough, meaning there might be some typos and whatnot in it. But I read a copy of the transcript from the hearing that took place before Judge Finnegan.

I don't know that defense counsel has had an opportunity to see that, because I don't know if that was prepared just for me or if that was put on the record.

I mean, is there a copy of the transcript on the record?

MS. MOTTA: Not that I am aware of.

THE COURT: Okay.

MS. KLAMANN: Not that I am aware of either, your Honor.

THE COURT: That may be something that a court reporter in the building did as a courtesy for me.

But I am happy to hear things, again, as we have new defense counsel. And I don't want to prejudice her in any way.

MS. KLAMANN: Yes.

Your Honor, the government's plan was to just start from the beginning.

THE COURT: I think that is -- I think that is -- smart. Okay.

So -- so -- would you like to begin?

And do you -- would you like to sit down, Mr. Berger, or are you comfortable?

I know you have some health issues. So, I don't want to make you uncomfortable in any way.

MS. MOTTA: Do you want to sit?

THE COURT: You can sit at the table with your lawyer or you can sit at a table by yourself, or however you are comfortable.

Or you can stand.

(Brief pause.)

THE COURT: We can roll a chair over to you. Would

you like that?

THE DEFENDANT: Oh, I see. Thank you.

(Brief pause.)

THE COURT: Very good. Perfect.

Okay. Go ahead, counsel.

MS. KLAMANN: Your Honor, the defendant has now been indicted for making threats against members of the FBI.

Specifically, the defendant has made a number of threatening phone calls to the FBI; and, most recently, he showed up to one of the FBI's offices and tried to force his way in.

At the initial detention hearing, I played two of the recordings of the threatening phone calls that the defendant has made.

I propose playing those, too, for you, again, this morning, with an additional third call that underlies Count 2 of the indictment.

THE COURT: Go ahead.

(Brief pause.)

MS. KLAMANN: So, your Honor, the first call that you are going to hear occurred on June 27th, 2017. The call was placed to FBI Chicago and re-routed to the FBI's public access line because it occurred after hours.

The other voice you will hear is the voice of the operator in West Virginia.

THE COURT: Did you say it was placed to the Chicago office and re-routed?

MS. KLAMANN: It was, your Honor.

(Whereupon, said audiotape was played in open court.)

MS. KLAMANN: The next recording I want to play for your Honor is a Voicemail that was left in early December -- December 5th, to be exact.

It was placed with the Department of Justice, Office of Inspector General, located in Tucson, Arizona.

This call is not one of the calls that was charged, but I did play it at the initial detention hearing with Judge Finnegan. So, I would like to play it for your Honor, as well.

THE COURT: Is that 2018?

MS. KLAMANN: 2018, yes, your Honor.

THE COURT: Okay.

MS. MOTTA: It is -- I am sorry -- not one of the calls charged?

But neither is the one you just played, correct?

MS. KLAMANN: This is, yes.

MS. MOTTA: The first one you played?

MS. KLAMANN: Yes.

(Whereupon, said audiotape was played in open court.)

MS. KLAMANN: The final recording I would like to play for your Honor is the call defendant made to the FBI on December 14th, 2018.

Like the first call that we heard, this call was originally placed to the FBI in Chicago number and was re-routed to the FBI's public access line, where it was, again, answered by an operator in West Virginia.

(Whereupon, said audiotape was played in open court.)

MS. KLAMANN: Three days after that phone call, your Honor, the defendant appeared at the FBI's office building in Rolling Meadows. He encountered a woman in the parking lot and made additional threatening statements to her, saying he was going to get the FBI; he was going to make the FBI pay; he was going to change the flags outside that office building to Russian flags.

After that encounter, he proceeded into the building and up to the 10th Floor, where the FBI's offices are located.

He then went down a back hallway and approached a staff member in one of the FBI's offices.

That day he was wearing black basketball shorts and a large oversized black hoodie sweatshirt.

He pulls the hood of his sweatshirt over his face and looks through the peephole in the back door to the FBI's offices.

He, then, rings the bell repeatedly.

Finally, an FBI employee asked through the door who it is.

He responds, "Matt -- Matt Berger."

The FBI employee opens the door, thinking that perhaps it is a deliveryman or an FBI agent or someone there to meet with an FBI agent.

Upon seeing the defendant standing there in all black, with a hood over his face, he becomes alarmed and tries to shut the door.

The defendant takes an -- takes an -- aggressive step towards the door, places his foot in the way of the door and grabs the door to pull it open.

The employee was rather frightened and forcefully pulled the door shut.

Your Honor, it is safe to say that the nature and circumstances of the offenses with which defendant is charged are very serious and support detention in this case.

I expect defense counsel will argue today that defendant appeared at the FBI's offices on the 17th for a legitimate reason; namely, to file a complaint.

Nothing about his behavior in the FBI's offices that day suggests that he was there to file a complaint.

He got off the elevator on the 10th Floor. Instead of proceeding through the FBI's main entrance to his left, he went down a back hallway.

He pulls his hoodie up over his head to disguise his face before he rings the doorbell.

He makes an aggressive move to try to pull the door

open when the employee opens it.

None of this indicates he wanted to make a complaint that day.

If he had wanted to make a complaint, he should have proceeded through the FBI's main office door and had a conversation in a non-threatening way.

All of the evidence indicates that he was there that day to threaten and scare the FBI, if not worse.

Luckily, we will never know what he was there to do because of the quick thinking of the FBI employee who answered the door.

Your Honor, in terms of the strength of the evidence, you heard the phone calls. We know that defendant made these calls because his voice matches the voice of an individual who made other calls.

The voice is the same in all three calls. In two of the calls, he identifies himself as Matthew Berger.

All three calls were also placed to the Chicago office where defendant is located.

And defendant also placed two additional phone calls on June 27th, 2017, to FBI Chicago.

I have those recordings and I am happy to play them for your Honor, if you believe it would be helpful.

In those phone calls, he tells the FBI that he will be coming down to their offices.

We know that he did go down to their offices the following day, on June 28th, 2017.

Part of what I submitted to Judge Finnegan was a Visitor Log entry for his appearance at the FBI offices that day, confirming that he was, in fact, there.

And one other thing I would like to note to the Court about that Visitor Log entry is instead of providing a driver's license or other ID to the FBI on June 28th, 2017, the defendant provided his FOIA card.

I believe this is additional evidence of defendant's intent to make threats against the FBI.

And, then, your Honor, with respect to Count 3, the defendant was positively identified by both witnesses at the FBI field office: The woman that he encountered in the parking lot and the FBI employee who would not give him entrance to the back door.

The defendant also admitted to Rolling Meadows PD that he was at the FBI field office that day.

So, the evidence against defendant in this case is strong and also supports detention.

Finally, your Honor, the defendant's history and characteristics also support detention here.

In response to Judge Finnegan's request for additional information, I have provided the Court with previous police reports, Officer Safety bulletins and law enforcement reports

from this defendant's previous encounters with law enforcement.

These documents show that defendant has a long history of aggressive and threatening behavior toward law enforcement; and, that defendant has access and possession of weapons.

For example, in 2017, law enforcement encountered defendant sleeping in his car and located two rather large knives.

THE COURT: And when was that, 2018?

MS. KLAMANN: January, 2017.

THE COURT: January of 2017.

MS. KLAMANN: Two rather large knives in his car, as well as a can of Bear Mace.

A Secret Service report, that I also provided to the court in response to Judge Finnegan's request regarding that agency's interactions with defendant, detail how defendant made statements to that agency in April of 2018, indicating that he was being harassed by the FBI and intended to purchase firearms in self defense.

The clear inference there, your Honor, is that defendant believed he needed to purchase firearms in order to defend himself against law enforcement.

And, in fact, as we saw in the ATF reports and information provided by defense counsel, defendant did purchase two firearms in July and August of 2018. One of them was a handgun.

And he also purchased a rifle.

Now, those guns were surrendered to, I believe, Rolling Meadows Police or Skokie Police, along with his FOIA card. But we have no way of knowing if defendant has access to additional firearms or weapons.

All of these factors indicate that defendant is a danger to the community and should be detained pending trial on these charges.

Additionally, your Honor, we still do not have information regarding defendant's residence, employment and source of income.

Defendant's counsel provided an affidavit of defendant's girlfriend stating close to a dozen different suburbs at which defendant and his girlfriend were allegedly living in hotels.

She did not provide any additional information about where they were living. That will make it extremely difficult for Probation to supervise him during the pendency of these charges.

At the last detention hearing, defense counsel also suggested defendant's father as a third-party custodian. I am not sure if that is still an issue that is before the Court.

For the government's position, your Honor, the government found that the information defendant's father provided in response to Judge Finnegan's questions was very

dissatisfactory -- unsatisfactory.

He didn't know his son's phone number. He didn't know the last job his son had had. He didn't know where his job -- where his son was living.

All of this indicates, as I believe defendant indicated to Pretrial initially, that he does not have a relationship with his father.

And, under these circumstances, the government has serious concerns whether his father would be able to ensure his appearance at court dates and his adherence to pretrial conditions.

So, your Honor, for all of these reasons, the government asks that defendant be detained in this case.

MS. MOTTA: And, your Honor, before the -- before the -- defense starts, I would ask if the state is going -- if the government is going -- to rely on a June, 2017 call -- 2017 call -- to indicate that the voice there was Mr. Berger and, then, Mr. Berger arrived there, I would ask that they play those.

THE COURT: Sure.

(Brief pause.)

THE COURT: Can you give us the date, counsel, of the call?

MS. KLAMANN: Yes, your Honor.

This -- these -- both of these calls were also made on

June 27th, the same day as the initial call.

And I believe both of these calls were also made to FBI Chicago and re-routed to the public access line.

THE COURT: Okay.

MS. MOTTA: And how do you know that?

THE COURT: June 27th.

(Whereupon, said audiotapes were played in open court.)

(Brief pause.)

MS. KLAMANN: That is it, your Honor.

THE COURT: Thanks, counsel.

MS. MOTTA: I believe that there was one other phone call, that the government is in possession of, in 2018.

There were two phone calls that they believe to be Mr. Berger, as well.

MS. KLAMANN: I played that.

MS. MOTTA: Okay.

MS. KLAMANN: That was the second phone call made to Department of Justice OIG, your Honor.

THE COURT: Yes.

Okay. Counsel?

MS. MOTTA: First and foremost, your Honor, I think that the call where the person spoke of a "we" and talked about the individual had something wrong with her parents and that they were going to kill people, to me it sounds absolutely

nothing like Mr. Berger. And I don't think that the government or the FBI have any basis whatsoever to allege that it is.

Mr. Berger always, on the calls that the government -- where he has identified himself, he is not making any threats, although he is not -- he is not being very polite.

You know, I think that the government is asserting that he has shown throughout time to be a danger to law enforcement and to be aggressive with law enforcement.

I think what has been shown is that, as a result of his personality type and overall lack of ultra-respect for authority, that he is the personality type that is often getting a hard time from law enforcement.

The indication from the -- what happened in June of 2017 -- or on June 28th of 2017 -- what the government hasn't informed us is what transpired that day.

He went down. He talked to the police -- to law enforcement. He talked to them about Jan Schakowsky.

He had been making multiple calls to multiple government agencies about Crohn's Disease coming from chemicals that are in the milk, with the FDA, and the failure of the government to put policies in place and protocols in place to protect against that.

As an Ashkenazi Jew, he has -- and he his -- he has Crohn's Disease. And it is -- he is accurate in his thinking that Crohn's Disease is, statistically, a much higher problem

with Ashkenazi Jews.

He was making phone calls to another Ashkenazi Jewish Congressperson. And he went down to the police -- to the FBI -- office and spoke to them about that; and, that he wasn't -- he was a peaceful person and he was just trying to create -- that was his way of protesting and activating -- being an activist, was by making these phone calls.

Because he was arrested during a sit-in protest in person and resorted to making phone calls as a way to express his opinion.

If they lined this up with the many other phone calls that he has made to various government agencies, they would see the same line of speaking about how sick he is.

He is blaming the government for how sick he is.

He had tried to file lawsuits against the government. He had made calls about making lawsuits and, "I am not going to forget you because I am going to sue you."

But what I find most important is how the government is describing what transpired at the FBI offices in December of 2018.

When you look at the report of Carla McDuncan -- and the government did provide that. That was a supplement. The report is 18-8888 in their materials. She goes through what happened. And it is clear that there was a misunderstanding between these two people.

First of all, there is zero indication -- and I have never heard anyone contend, nor does the photograph shown show -- he covered his face with his hood. What she said was he had his hoodie up.

So, if the government is saying that he put his hoodie up, that is very different than using his hoodie to pull over his face.

She said that he -- she commented that everything was fine until she thought that he was going to use forced entry.

"She explained that on today's date, between 8:00 and 8:30, the doorbell rang," or it was chiming.

When she said, "Who's there," the male replied, "Matt."

And she said, "Can you repeat that?

"Matt Berger," in a questioning tone.

And, then -- oh, can you repeat -- I am sorry.

"She explained and repeated 'Matt,' in a questioning tone. And the male said, 'Matt Berger.'

"As she was opening the door, Carla explained that based on the way he said his name and the confidence, because he came to the door, she thought it was someone she knew.

"Once she opened the door and saw him wearing navy -- dark navy -- blue, or a black hoodie worn up, a baseball-style had with a white rim and what appeared to be basketball shorts, she then realized she didn't know him and she began to close

the door.

"However, he had already, as the door opened -- and is normal social norm -- he began to approach the door."

So -- so -- she is on the other side thinking -- and I am not blaming her necessarily for thinking it -- that someone is barging through and he is on his way in, wondering, "Why is she slamming the door on me," towards the end, or "What's going on?"

She even comments that he said, after all of this happened, "Are you okay? What's going on in there?" Because he thinks there is some sort of -- something happening on the other side, that she is closing the door because she is in danger from something going on there.

He is the one that calls the police. He calls the police. He goes to the police department. They didn't need to look for him.

It is all in the reports, that he describes almost the identical situation: That he first tried the main door and there was no one there.

THE DEFENDANT: It was under construction.

MS. MOTTA: I understand, but the under construction issue is not in the report. So, he I was -- I am speaking as to what was in the report.

But he had tried other -- other -- doorbells or areas and there was no one there.

So, he went to that door. He said his name. As the door was opening, he starts to say he was there to file a report.

In time, Carla says, as she was opening the door, he might have started to saying something, but she couldn't recall what.

And, then, as he started to approach the door and open it -- which opened outwards -- that she pulled the door -- that the door was pulled shut under his foot, as he was approaching.

And, again -- I am sorry, but to go back to Carla -- she says, "Carla indicated that he may have been trying to say something during this time, but she couldn't recall because she was focused on his entry into the office.

"She explained that when she was pulling the door closed, he was trying to hold it open and pull it outward.

"He came forward with his foot, as she was trying to pull the door closed.

"Carla indicated during this time she saw that he was wearing tennis shoes. She commented that she really felt he was going to try to come in -- that he was coming in or trying to come in.

"She stated she had no doubt about it.

"She indicated that her adrenalin and the need to protect herself kicked in and that she used all of her weight to pull the door, and that this door was not designed to close

by itself, acknowledging that it was a good indication of how much effort she was using.

"Carla indicated that she felt like she would have to kick him or push him, although she didn't have to do anything.

"She indicated that once the door closed and slammed hard, she was shaking and she heard him saying, 'Are you okay? What's going on in there?'"

Now, when you compare that to what Matthew Berger says he had reported happening -- and, again, he called the police and indicated that he was going there. And, then, he, in fact, went there. And when he got there, he started talking about how he wasn't working, because he had Crohn's Disease.

And he stated he went to the FBI to file a complaint against FBI Special Agent Joseph Pachefski (phonetic).

Now, that is the same agent who issued the affidavit from Mr. Berger, who is here, who had called the house asking for him to come.

My office was also in court with him the day before this, where that same agent approached him and my associate very aggressively, asking to speak with him about phone calls that were made.

My associate told him that that was not something going to happen there.

However, he went down, nonetheless, on his own to -- and, specifically, was referencing FBI Agent -- Special Agent

-- Pachefski (phonetic).

"Berger explained he went to the 5th Floor by mistake. Then he looked up the address; realized it was the 10th. He indicated that when he arrived there, the main office looked closed. He looked around and went to another door to speak with someone."

Okay?

(Brief pause.)

MS. MOTTA: "But when the female voice asked, 'Who,' he replied, 'It's Matt.'

"He explained, then, the female started to open the door, which opens out. He started to take one step and he said, 'My name is Matthew Berger.'

"Berger indicated at that time that the female tried to slam the door closed. The door hit his foot. He claimed his foot was not in the entranceway, but it was in the path of the door, which, again, opened outward.

"He indicated that the door was shut by the female.

"He made comments indicating that he inquired if she was okay, to the effect that he didn't know what was going on in there or if someone had been behind the door with a firearm.

"Berger related that he left the building.

"When asked about the comments purportedly made to the other -- to the unrelated female in passing, he indicated that he had no -- he had no -- comment."

So, when you compare the two statements, it is very clear that the woman who opened the door assumed she was going to find someone on the other end who was supposed to be coming in that door.

And when the woman opened the door, after he announced who he was, he assumed she is allowing him entry or allowing to speak to him or starting to engage him in some way. So, he begins to approach.

But he never threatened her. And the police didn't find any weapons on him. They didn't find any reason for him to be -- to cause any sort of harm.

And when they talk about the woman in the parking lot, she said that, "There was a white male wearing a black jacket, with black shorts and a white baseball cap walking behind her. She thought he was on the phone, but then realized he was speaking to her.

"He stated that the subject told her, 'These flags out front should be changed to Russian flags.'

"He stated that -- he followed up saying -- 'Fuck America' and someone, some day, he was going to fuck up the FBI.

"Then she stated the subject walked passed her, entered the building and appeared to be walking into the cafeteria."

So, all of these other things that they are saying

that he was saying, and the defense, then, would proffer that he was, you know, talking aloud about the flags and that the FBI had fucked things up, whatever.

You know, one way -- either way -- there was nothing about that: About killing anyone, about injuring anyone, about threatening the life of anyone.

And just the agent, that has been sort of involved with him for several years -- multiple calls to his parents' house -- I have spoken with him, as well. He is aware of his contention -- that the government is responsible for making him sick; and, that he is going to expose the government for their failure to check the milk for a very -- there is very -- certain protocols they could do to get the --

THE DEFENDANT: Microbacterial and paratuberculous, a close relative to the death with respect to (inaudible).

It is a bacteria that survives pasteurization.

MS. MOTTA: A bacteria in the milk that could be taken out if the government did something about it.

But his position is that it affects a small group of people -- it happens to be his people -- and that the government is just not taking action, despite this.

So, his many calls are often -- you know, he considers himself a whistleblower -- that he is bringing this out. And he considers himself -- that the -- that the government is his enemy, because they have made him sick and they won't do

anything to make it right, so that other people won't get sick -- children who drink milk and everyone who drinks milk.

But, again, he takes the position that it affects a small group of people, so the government doesn't care and they are allowing it to go on.

Now, the government also took the position that he may have more weapons; they don't know where he is living.

With regard to the weapons in Skokie, he went and returned -- turned -- in his firearms to Skokie on his own, because he was thinking about getting a mari- -- a Cannibis -- card.

And he believed that that -- from a conversation with the State Police, that that -- was appropriate.

So, he took his weapons to the police department on his own.

(Brief pause.)

MS. MOTTA: And he -- and he -- will be living with his parents when he leaves from here.

So, which hotel -- he is not going to be staying at hotels anymore.

We did submit the affidavit of his girlfriend to explain why they were -- they did a lot of traveling for six months to various places.

He was very sick with Crohn's Disease at the time. So, was not working during that period -- during that period --

of time.

But there is -- there is -- nothing in his history that suggests that he is a physically violent person, but may be a somewhat misunderstood, easily misinterpreted.

And, again, his -- he is clearly suspicious of government intentions. And it stems from -- some of which stems from -- the 2007 arrest with relation to the -- what was entitled as an assault at some point.

As the report shows, a plain-clothed officer, who was in his house, seeing Mr. Berger ride his bicycle, appearing to be looking in the windows of cars, runs out and scares him.

He does -- whether he said he was a police officer or not, the reports say that he announced himself as a police officer and that Mr. Berger heard that.

He was not dressed like a police officer. Mr. Berger has no idea why he is running out. Suspicious overall. And he could have been -- as many women can tell you, people hold themselves out as police officers, you know, and they are not sometimes.

But it ends up that he had just gotten a haircut and he was looking in the reflection of the windows of the cars for his haircut.

He has never stolen anything. He lived in the general area. He -- you know, like that -- he was not stealing something.

But I can also see the officer's point of view. He is in the house and looking out and he sees someone appearing to be looking in windows.

In his experience, in his opinion, that is someone who might be robbing a car.

Well, on the other hand, he is riding -- he just got a haircut and riding his bike back to his parents' house, and some crazy person runs out screaming and yelling at him to stop. And he is trying to get away from this person.

At that point in time, the police were -- indicate that he called 911 and he asked 911 if this person -- because he tried to -- he did hide --

THE DEFENDANT: I had spoken to Com Ed.

MS. MOTTA: He --

THE DEFENDANT: I was on the phone with them.

MS. MOTTA: Okay.

He asked if the person was really a police officer.

911 told him, according to the reports, "Yes. And you should listen to his commands."

There is nothing thereafter to indicate whether he -- that he was no longer listening to the commands.

But on those, you know, follow-up reports, you have got, from the 2000- -- the -- sorry.

The reports -- the alerts -- it specifically says that it was an incident involving a plain-clothed officer.

So, these incidents, you know, they come together, you know, in addition with his -- his -- sort of personality type and, you know, overall failure to respect authority in the way they are used to being respected, and his belief that he has a constitutional right to speak out and he has a First Amendment right. And he is going to use certain tones of speaking and ways of speaking to think that people are going to now listen.

But what he has never done is acted violently -- physically violently.

He has never -- he has never -- used the weapons. There is no allegation that he has ever arrived anywhere with a weapon.

When it came down on -- if they are so concerned that he is going to come down -- come in there tomorrow -- when he came there tomorrow, what did he do on June 28th, 2018?

He didn't do anything. He spoke to an agent about --

THE DEFENDANT: 2017.

MS. MOTTA: 2017.

He spoke to an agent about what was going -- what was going -- on.

He has filed multiple complaints against the special agent at issue. Whether those complaints are meritless or not, whatever the case may be, he has told multiple government agencies he is going to sue that specific agent, as well as other people.

His father's affidavit -- and he would be willing to testify that he had been calling, asking to speak with him.

And, again, my office was in court with him just before that, with him asking to speak with him.

So --

THE DEFENDANT: And he came to my parents' house.

MS. MOTTA: I know.

In addition to -- so, the assertion that he is the person who made this call or -- none of the calls -- none of the other calls -- is someone using a -- speaking in a third-party or talking about a "We" -- "We are going to kill you and we are going to hurt people, empower your parents."

That is not the type of language or the way of speaking on the other calls. The other calls are using foul language, yes. Most of the time, asserting his name.

And I don't think that there is any basis whatsoever to associate that call, from 2017, where the person says, "We are going to kill you and we are going to kill everyone," that the strength and the evidence just doesn't support -- doesn't support -- their assertion.

But what their own reports indicates is that despite his lack of respect for authority, that he is -- he is -- honest and truthful.

His description of what happened in that FBI office in December of 2018 is almost identical to Carla's. It is just

the other perspective.

And the fact that he asked at the end and was concerned -- "Are you okay? What's going on in there?" -- shows that he is thinking she is responding to something going on behind her, because he has no idea why she is responding in the way that she is.

Now, I also acknowledge that a social norm is to, you know, not go to a door that isn't an open entry, you know, and try to get in, but -- or buzz. But it is not like he banged or he -- you know, he literally said his first and his last name.

And when he described the story, he said it the same way: "First I said 'Matt.' And, then, as she started opening, I said, 'I am Matthew Berger,' and I started to explain that I was here to file a report against this officer. But before I could even get that out, she pulled the door on me with all of her weight."

So, you know, both stories line up. It is just what is in this subjective mind of one person and the subjective mind of the other.

And the government's assertion that whatever was said in the parking lot means anything more than, you know, somebody blowing off steam about hating the FBI or thinking that there is going to be Russian flags.

She didn't say, "I am going to put Russian flags here." That is not what the witness even said.

(Brief pause.)

MS. MOTTA: The -- the -- I think that it is -- that trying to paint a picture of a person who is a danger to the community, to such an extent as to deny them any bond -- to hold him pretrial for speaking out and asserting his First Amendment right not in the most polite way, and maybe not in the best way; but, nonetheless, these are words that were spoken.

And he never threatened to harm anyone.

And when you take all of that in conjunction with everything that the other -- the other conduct of, you know, filing -- you know, speaking of filing lawsuits, of making complaints against this officer -- against this special agent; you know, a threat of exposing someone or suing someone is a lot different than threatening to kill someone.

THE COURT: All right. Okay.

Go on.

(Discussion had off the record between the defendant and his attorney.)

MS. MOTTA: As an offer of proof, also, Mr. Berger -- his father -- who did see some of the treatment that Mr. Berger got from law enforcement, again, when you don't treat law enforcement with respect, they tend to not like that. So, it is not unusual that he would be treated super aggressively for that.

And, you know, they do acknowledge that they pulled a gun on him.

Now, here, again, with that officer in 2007, he thinks the kid is coming at him and he is going to hit him with the bike, where Mr. Berger thinks, "This crazy person is coming at me. I am going to dart passed him and get away from him."

But, again, the officer says he pushed him off the bike to avoid what he believed Matthew Berger was going to do; and, Matthew Berger was trying to escape because of what he believed this person, for whatever reason, claiming he was an officer, was going to do.

And, again, Mr. Berger is indicating that -- or his offer of proof he would indicate that -- they held him by the neck. They --

THE DEFENDANT: No, that was immediately when they came to arrest me.

(Discussion had off the record between the defendant and his attorney.)

MS. MOTTA: His father -- as an offer of proof, Mr. Berger would testify to the events that occurred when they came back to arrest Mr. Berger, who had been -- to arrest the defendant who had been -- talking about, to law enforcement, wanting to sue the off-duty officer who threw him to the ground and pushed him off the bike when he was trying to escape him.

He would be able to speak to him being choked and

being thrown and the way that they treated him.

So, Mr. Berger -- and not by no fault of his own, but maybe not all the fault of his own -- has a very difficult relationship with law enforcement and history. And he is, as a result, very skeptical and does lack -- doesn't have respect for law enforcement.

But that doesn't mean he is going to physically harm them. And there is nothing -- nothing -- that the government has tendered that says that he was -- he will.

Both of his parents are here and present. They are both supportive.

I saw nothing about them having no relationship. They would both speak to the fact that he -- that they -- have a close family relationship. They visit each other, you know, often.

Maybe not the same type of relationship or closeness that -- there was some reference in the report that they weren't -- that they weren't -- close; but, I think that there was -- there is some sense amongst the family that his whistle-blowing and his calls have resulted in at least this special agent, who has often called and gone to the house and called their place of employment, arrived at his -- where he worked and left an anti-terrorist -- I mean, where he lived, and left an anti-terrorist -- business card with his landlord, which he didn't live that much longer after that.

You know, but he is feeling harassed by law enforcement, and law enforcement is feeling that he is harassing government agencies by calling and making complaints about -- many of which were not played here today, but many of which the government -- the government -- has.

And he states his name and talks about his Crohn's Disease. And, as all of these reports say, once they get in a room with him, he starts spewing off about how the government's injured him and he has Crohn's Disease and it's the milk and it's the this.

Not that he is going to blow anyone up; not that he is going to kill or hurt anyone.

But his parents will be custodians. He is living with his parents during the pendency of this case. And his parents would be willing to make sure that he got to court and keep him supervised.

I believe they are home most of the day. They are at home. So, as far as getting to court, that will not be an issue.

We did tender -- and maybe there has been some overlap with the government and the e-mails -- his work history. He was doing -- but that was not for the past six months. He was sick and you have his medical records for that. But he was driving an Uber and driving with Lyft. And the other reports that we gave and his -- PostMates?

THE DEFENDANT: PostMates.

MS. MOTTA: PostMates, the courier service.

So -- and his girlfriend, who is here, she would be willing to speak on his behalf. And she makes a very good living at what she does.

And, you know, they travel a lot and they were looking to buy a home.

I don't think --

THE DEFENDANT: They recommended it -- recommended it.

MS. MOTTA: Can you stop? Can you stop?

I don't think that it is, you know, that unusual, although I can see why, looking at everything overall, someone would think that that is, you know, another aspect of something that is unusual and speaks to the stability of a defendant.

I can see, obviously, that perspective, as well. But I really think that a lot of this is going to the government agents or the law enforcement involved. You know, every little interaction with the police becomes a little note.

So, then, someone sees the note. "Oops, I see he had an assault with an off-duty officer."

Now, that is carrying over. So, then, they are searching the car and they are looking at their Mace and thinking, what?

But, again, there is nothing that rises to the level as to deny -- to be as severe a penalty or a denial of his

constitutional right to be free and assist in his own defense here.

There is nothing to show that he won't come to court and there is nothing to show that he is a danger to -- other than annoying people, you know, there is nothing here to show that he is an actual danger to -- the public.

And I think that that, essentially, covers everything.

But as far as that first phone call, I have -- it doesn't sound anything like all of the other phone calls. And there were four others that, at least, the government played here.

And none of those did they use the "we" to talk about killing. It was a different tone. It was a different tense. It was a different -- the level of speaking was different.

And I believe that the government is going to be unable, as far as the weakness of the evidence or the strength of the evidence analysis, as it relates to the detention part, that there is no strength that that -- that that -- really is this defendant.

And as far as that he had tried to gain entry to a government building, I don't believe knocking on the door and asking to come in is a violation of federal law.

Now, what she interpreted on the other end, I think when you read both reports in conjunction with each other, it is clear that as she opened the door, he thought that she was

going to engage in a conversation.

And when she saw him, she got horrified.

Rightfully so, but -- in this day and age. But it doesn't make him being there a crime, just because the person on the other side interpreted him as someone going to commit the crime.

Thank you.

THE COURT: Uh-huh.

Do you have anything further?

MS. KLAMANN: Briefly, your Honor.

The facts, from the government's perspective, that are most relevant to the determination today -- which is detention -- are that the defendant has weapons in his possession.

We know that he had knives. We know that he had Bear Mace. And we know that he had firearms.

The defendant also, in the last six months, has been moving from hotel to hotel in the suburbs. That suggests he is trying to evade law enforcement. He doesn't have a permanent residence.

That, combined with the threatening phone calls that you heard, your Honor, are very, very concerning to the government.

And, then, shortly before Christmas, he actually tries to get into an FBI building.

All of this indicates that he is a threat and a danger to the community and that is why we are seeking detention here today.

THE COURT: Can I just ask you to replay the December 5th?

Because that is the one where he says his name, right?

MS. KLAMANN: I believe both the December 5th and December 14th calls he says his name.

THE COURT: Okay.

And can I just ask you to replay those?

MS. KLAMANN: Sure.

(Whereupon, said audiotape was replayed in open court.)

MS. KLAMANN: That was the December 5th call, your Honor.

(Whereupon, the second audiotape was replayed in open court.)

THE COURT: Okay.

So, you are right. They are not direct threats to kill.

MS. MOTTA: Correct.

THE COURT: So, the statutory maximums, are they, you know, sort of ten years on these kinds of things?

MS. KLAMANN: I believe, your Honor, on the first two counts the statutory maximum is twenty years --

THE COURT: Uh-huh.

MS. KLAMANN: -- for an 875(c).

THE COURT: And the Guidelines, are they two to three years?

MS. KLAMANN: I am sorry, your Honor. I don't have that in front of me.

(Brief pause.)

THE COURT: So, can I talk to the father?

MS. MOTTA: Yes.

MR. B. BERGER: Yes, I wanted to ask permission to approach the bench.

Yes, I am Bernard Berger.

THE COURT: Can you state your name?

MR. B. BERGER: Bernard Berger, B-e-r-g-e-r.

THE COURT: And are you employed?

MR. B. BERGER: I am retired. I am 71 --

THE COURT: Okay.

MR. B. BERGER: -- going on 72.

THE COURT: Okay.

How long have you been retired?

MR. B. BERGER: About eight -- no, maybe about twelve, thirteen years.

THE COURT: Okay.

MR. B. BERGER: Twelve years.

THE COURT: So, what do you do all day?

I mean --

MR. B. BERGER: I take care of my wife. She is disabled.

I was a caregiver for my mother-in-law, who had Alzheimer's --

THE COURT: Okay.

MR. B. BERGER: -- for twelve years. And a bad heart.

She lived with us.

THE COURT: Okay.

MR. B. BERGER: Matthew's grandmother.

THE COURT: And you do errands: Go to store, things like that?

MR. B. BERGER: Oh, yeah. I am always shopping and picking up medicines and going to the doctors.

THE COURT: Okay.

How long have you lived in your apartment?

MR. B. BERGER: Nineteen-and-a-half years.

THE COURT: What did you do for a living?

MR. B. BERGER: I work 28 years at the Art Institute, in the Security Department.

THE COURT: Okay.

MR. B. BERGER: I mostly took care of fire protection and safety.

THE COURT: Okay.

So, Matthew has had health problems?

MR. B. BERGER: Yes.

THE COURT: And he is, what? 32, 34?

MR. B. BERGER: 34.

THE COURT: 34, yes.

What is -- I need to understand your relationship with him.

So, he went to college. He didn't graduate. That was -- he was probably 24, 25 at the time.

What is your relationship with him, basically, since that time -- since, let's say, age 25?

So, the last nine years.

MR. B. BERGER: Okay.

Well, he was in school later on, also --

THE COURT: Okay.

MR. B. BERGER: -- and I would help him out. I would give him money every week until April of 2015.

THE COURT: Okay.

MR. B. BERGER: And he would ask for -- comes over every couple of weeks. And sometimes he needs money and I will give him money.

THE COURT: Uh-huh.

MR. B. BERGER: Not as much as, you know, a full --

THE COURT: Meaning all days, right?

MR. B. BERGER: Yeah.

And his mail is being sent to us, you know. And he

comes over and gets his mail.

I let him know about any phone calls; like, the ones that come from the FBI, from Special Agent Joe.

THE COURT: Uh-huh.

MR. B. BERGER: Which I told him about on the 12th or 13th of December.

THE COURT: Uh-huh.

MR. B. BERGER: He called on December 5th, I believe.

THE COURT: Uh-huh.

MR. B. BERGER: And I let him know about all of those phone calls.

He is not really happy that they're calling our house --

THE COURT: Uh-huh.

MR. B. BERGER: -- and he doesn't want us to be, you know, disturbed or don't get excited or feeling bad about what is happening.

THE COURT: Uh-huh.

MR. B. BERGER: But we have a good relationship.

Like I said, he comes over every couple of weeks and we sit and talk. And he gets his mail and I let him know about any telephone calls.

THE COURT: Uh-huh.

MR. B. BERGER: I try to encourage him to -- you know, to, you know, to -- work.

In fact, I have even -- you know, I actually -- maybe I shouldn't say this -- I don't know his actual symptoms. The symptoms of Crohn's actually came out -- came up.

He spent three days in the hospitals with IVs. I didn't know about that. He told me that maybe about three weeks ago.

THE COURT: Uh-huh.

So, you didn't know he had been back in the hospital?

MR. B. BERGER: No.

THE COURT: Yeah.

MR. B. BERGER: He doesn't want to, you know, disturb us. Because I remember, you know, his operation the first time, I spent the nights --

THE COURT: Yes, sure.

MR. B. BERGER: -- with him in the hospital at the University of Chicago. So, he didn't -- he tried to, you know, protect us. Keep us from, you know --

THE COURT: Worrying.

MR. B. BERGER: -- worrying, yes.

THE COURT: Yes.

So, do you know if he is working or where he is living or --

MR. B. BERGER: Well, he -- I knew he was possibly living in various hotels while they were looking for a house to buy.

THE COURT: Uh-huh.

MR. B. BERGER: And -- but I never, when -- many times that Special Agent Joe called, you know, I would say, "I don't know his address. I don't know his phone number. He is not living here."

THE COURT: Uh-huh.

MR. B. BERGER: But he continued to call.

So, I don't really know, to know the address of all of his hotels or his telephone number.

THE COURT: Uh-huh.

MR. B. BERGER: Okay?

THE COURT: Do you know your other son's address?

MR. B. BERGER: Yes.

THE COURT: Uh-huh.

MR. B. BERGER: He moved in, also, with his girlfriend.

(Laughter.)

THE COURT: Uh-huh. The girlfriends.

MR. B. BERGER: Yeah.

(Laughter.)

THE COURT: Does it trouble you to hear the tape recording calls?

MR. B. BERGER: Yes.

THE COURT: Yeah.

He is --

MR. B. BERGER: But I also -- but I also -- witnessed him getting, you know, harassed and, you know, being thrown up against the elevator by the arresting officers.

THE COURT: Uh-huh.

MR. B. BERGER: And I will tell you something. I even saw the second arresting at the Char Grill about two to three years later and I approached him, you know, and I wanted to know why -- you know, what they were doing. You know, why he was knocked off his bicycle.

THE COURT: Uh-huh.

MR. B. BERGER: Why the government pulled on him.

And he even admitted to me -- this officer, the corporal sergeant -- that, "Yeah, he shouldn't have pulled the gun on your son. He shouldn't have done that."

THE COURT: Uh-huh. Uh-huh.

MR. B. BERGER: So, you know, I could see where my son is coming from.

THE COURT: Uh-huh. Uh-huh.

MR. B. BERGER: I don't always agree with -- you know, but we do converse.

And I do see him every couple of weeks.

THE COURT: Uh-huh.

Do you argue, you and your son?

MR. B. BERGER: No, there is no fighting going on.

THE COURT: Uh-huh.

MR. B. BERGER: You know?

THE COURT: Uh-huh.

Is there room in our home for him?

MR. B. BERGER: Oh, yeah. He has his own bedroom there, with his bed and a desk.

THE COURT: Uh-huh.

MR. B. BERGER: You know, where he lived from '99 through 2011.

THE COURT: Uh-huh.

MR. B. BERGER: He also stayed there a week in 2014, while we were trying to find another apartment.

THE COURT: Uh-huh.

MR. B. BERGER: But they had a little apartment, which I have seen.

THE COURT: Uh-huh.

Okay.

Do you have any questions for me?

MR. B. BERGER: Not that I want to ask right now, your Honor.

THE COURT: Uh-huh.

MR. B. BERGER: Like, you know, I am just keeping it to myself.

THE COURT: Uh-huh. Okay.

Thanks very much for coming to court.

MR. B. BERGER: Okay.

Thank you.

MS. MOTTA: Your Honor, could I ask him?

THE COURT: Sure.

MS. MOTTA: Prior to July 1st -- so, June 30th, 2018 -- did you know where your son lived all of those other times?

MR. B. BERGER: I knew he lived on Barry Street in West Chicago. We went over there. I helped him move something he bought -- you know, a table or something -- and I knew he was in the, you know, the Palatine area, because I would drive him to the bus. He said he lived there.

I didn't know the exact address. I did not know his address in Palatine or in Deerfield.

MS. MOTTA: Okay.

But -- and is your wife home when you are running errands?

MR. B. BERGER: Yes.

THE COURT: And would you guys be able to -- would you be able to -- bring him to court? Would that cause any issues with you taking care of your wife?

MR. B. BERGER: No. This is the third time we have been to court.

MS. MOTTA: Okay.

And --

MR. B. BERGER: So --

MS. MOTTA: So, you were aware that they were traveling over the last six months --

MR. B. BERGER: Oh, yes.

MS. MOTTA: -- but you didn't know which specific --

MR. B. BERGER: At court, I was -- he said that -- he asked the judge, "Can I, you know, go to Wisconsin on Thanksgiving?"

MS. MOTTA: Oh, no, I understand that. I am just --

MR. B. BERGER: And he told me he was going -- traveling -- to warm -- you know, the South.

MS. MOTTA: But prior to court, during the six months where him and his girlfriend were traveling and staying in hotels, you knew that was going on while it was going on?

MR. B. BERGER: Yes, but I didn't know specific hotels. I just --

MS. MOTTA: Okay.

And he was still visiting you during that time?

MR. B. BERGER: Yes, he was.

MS. MOTTA: And how long would he stay?

MR. B. BERGER: He might stay for an hour or two.

So, he would eat something. It was a special diet.

So, like, right now, I have Almond milk ready for him, because of his Crohn's, and some other fruit stuff.

MS. MOTTA: And is his girlfriend living with you now?

MR. B. BERGER: Yes.

THE COURT: Does watching TV -- like, the news -- does that agitate him?

MR. B. BERGER: It agitates us, yes.

THE COURT: Uh-huh.

MR. B. BERGER: I mean, what's going on with the government and some newsworthy things that are agitating, yes.

THE COURT: Do you argue about politics?

MR. B. BERGER: Oh, a little bit, you know.

But, you know, I just tell him, "Don't believe all of that stuff on the Internet -- "

THE COURT: Uh-huh.

MR. B. BERGER: " -- or what the President is saying." You know, "Go to newsworthy sources, like the New York Times or the Tribune -- "

THE COURT: Uh-huh.

MR. B. BERGER: " -- or network news."

THE COURT: Uh-huh.

Well, thanks very much for many coming to court.

MR. B. BERGER: Okay.

Thank you, your Honor.

(Brief pause.)

THE COURT: So, I don't -- I am supposed to take into account the weight of the evidence. And I am going to focus on the 12-5 and the 12-14 calls, because the defendant identifies himself.

And I don't know whether those other calls are him or not and I can't hear them. I am just not going to include those as much in my thought on the bond, because I don't know if you are going to get voice experts or what you are going to do, in terms of your beyond a reasonable doubt requirement.

But it is easier for me, in terms of the calls, where he identifies himself.

And I appreciate defense counsel's argument, that in those calls they are not direct threats of death.

They come very close, when you say something like, "You are going to remember my name," and, "It is time for you to get a taste," or something like that, "of intimidation. And you are my enemy and it is not a good idea to be my enemy."

So, I would say we are very thin -- we are razor-thin -- close to a direct threat of death, but we are a thin slice away.

And, then, of course, there is the showing up at the office.

I appreciate defense counsel's explanation and arguments about the visit to the office and the entry into it -- the buzzing of the bell and all of that. So, I appreciate all of that cooperating and whatnot with the Rolling Meadows police.

I think that if you look at 3142 -- 18 U.S.C. 3142; actually, (f) -- oddly, this is an offense where the government

has to prove that he is a serious risk of flight or a risk that he will obstruct or attempt to obstruct justice, as opposed to a danger.

There is this little trick in the statute.

There is no rebuttable presumption, of course.

So, the fact -- I have to consider the same factors I always do -- the nature of the offense; the weight of the evidence; the history of the person -- but I have to find, based on all of those things, that he is a risk of flight.

And the danger to the community is not as significant under 3142(f) as it is for other offenses that are charged.

The government may disagree with me on that. And I will cite some case law on that when I issue something.

So -- but there is no -- there is no -- doubt that this is a very serious offense. And it scares people, as defense counsel has said, given the world in which we live in.

But the woman who answered the door, we can all understand why she was concerned.

And the language that defendant uses -- even when he does identify himself by name -- whether those other calls were him or not.

And the weight of the evidence is going to be strong, particularly as to the calls that he identified himself.

And the history and the characteristics of the person are problematic not because I am particularly concerned whether

he was riding a bike in 2007 or even whether he pulled a fire alarm.

I mean, the offenses, themselves, are rather peculiar. And they are, in and of themselves, they are kind of petty.

But they are all troubling because they all have a lot of, I don't know if you would say, anger management. Impulsive.

I mean, I read through all of the records; and, in the one case where he leaves Skokie for some medical care -- I think Crohn's; I don't know if that is what it was, but he leaves for some medical care -- they take him by ambulance and they meet with him. And it is a nurse who makes a note that, "You need to go into psychiatric -- you need to go and get some psychiatric care."

And there is no follow-up on that. And that is up to him until somebody makes an involuntary commitment. But this -- and I am not -- that is not my expertise.

But it doesn't seem -- and there may be valid whistle-blowing issues here. And, you know, I don't know what Representative Schakowsky has done for him or how she has responded to him.

And, you know, there may be legitimate claims here about hormones and milk and his terrible physical suffering, but there is probably some help to be gained from that avenue, for this individual who clearly has some suffering going on.

And it is troubling to me that that has not been accessed. It is troubling -- very troubling -- to me that family and loved ones have not gone down that road; or, that a 36-year-old-man, who has responsibility for himself, has not gone down that road in any way and seems kind of oblivious to that even being an option.

Because it is -- most because I am a human being and it seems like it could be helpful; but, also, because it could be that this whole thing could be avoided.

And I am supposed to look at the nature and seriousness of the danger to any person in the community. So, even though, you know, I am supposed to be focused on whether he will appear, I still have to take into account the danger to the community.

And his parents seem like very good people. Very hard working. Very good people. But his lifestyle --

Mr. Berger, your lifestyle of sort of no job. I know you worked PostMates and I looked at your records there and I see very little earnings. And I know you are capable of much more. I know you are. I know you are smart.

And, so, I am seeing really no work. And I see you went to U of C for two nights and you refused all follow-up care.

So, you know, one of the things that worries me about sending people with chronic illness into the Bureau of Prisons

is that, you know, they are really stretched. And they try to their best medically, but they are really stretched medically.

But, then, I see you go to U of C, which is one of the best treatment places in the country and you don't take their care.

So, then, I think, "Oh, I mean, you might be doing better in the Bureau."

And, so, I am -- and, then, I don't see you getting any other clear for clearly some trouble you have; that, you know, you are not trying to access any care for that, and that troubles me.

And I am deeply concerned, although I am not going to detain you because of trouble -- because of danger -- to the community, but I am going -- but I am taking into account the seriousness of the danger to any person in the community and, my God, if you followed through on any of these threats.

If you did, how would your parents survive that?

How would they survive that?

They don't even want the FBI agent visiting their house and leaving a card.

I mean, the shame and the horror.

And I don't know if you are capable of that. I mean, I wonder.

I, honestly, in my gut, I don't think you are. But it just -- it comes up again and again and again, this kind of

impulsive, agitated, angry response.

But what I am concerned about, for the government, is I don't know if the Guidelines here are 18 months. And I don't want him sitting -- and Judge Durkin is very efficient, so I don't want him sitting -- for 18 months waiting for a trial. That is not reasonable.

And, frankly, I would rather him be getting some care. And I don't mean Crohn's care. I mean care.

Because -- and I don't know if you can try to work out something like this because, you know, if it was a -- if it was drugs, we would -- I would be talking about Gateway and I would be trying to work with Pretrial Services or something like that.

And this is not my area and I am way out -- way out -- of my lane here. But I am just seeing what I am seeing.

I mean, these offenses are ridiculous.

MS. MOTTA: Understood.

And the defendant is willing to, as a part of his condition of his bond, go to therapy. You know, engage and start at least some sort of --

THE COURT: Right.

I mean, there's medication. You know, this is -- and I understand that this probably started off as a real whistle-blowing and painful and he really -- and he might be a hundred percent right. I am not even saying that. But it has

turned into, it seems to me, a kind of obsessive OCD.

Like, this is -- yelling at the FBI about it is not getting -- is not enhancing your life. Like, you need to go on and live your life.

Whether somebody should be changing the milk or not, you need to live your life.

And you are not moving forward on your life, regardless of what is happening in the milk.

So, I am going to the detain him, but I want this reviewed.

Now, my concern is I am not the magistrate judge on the case and I don't want this -- like, I want this reviewed, you know, every ninety days because I don't think this probably carries -- I mean, I have not seen a case like this, but I am guessing, because there was no actual conduct, that this is not the kind of case that is going to carry -- that kind of penalty.

You are probably looking at me thinking, "Judge, you are out of your mind." And that is -- you are entitled to that opinion.

MS. KLAMANN: Well, your Honor, it is just difficult for the government to predict what kind of sentence will be entered.

THE COURT: Right. But he has no criminal history. He is going to be in a Criminal History Category I, for sure.

MS. KLAMANN: I think that is right, your Honor.

THE COURT: I mean, the whole bike-ride thing, that is not counting.

So, I am going to put that in my order. And if it has to be come back to me, I am happy to have it.

If you can come up with some kind of psychiatric thing; if, maybe -- again, I am out of my lane, but if -- you want to talk about that, Judge Durkin is extremely down to Earth, I find. So, if you want to take it up with him, I am going to put this in my order.

I am happy to talk to him.

But I am also concerned that Mr. Berger go out into the world without some kind of plan and we have a complete disaster on our hands come February 15th, that we are out of control of this.

Some of those phone calls and some of those statements appear -- they strike me as somewhat delusional. And that is -- and, again, I am out of my lane, but I am not -- I am not -- having that. I am just not having it.

THE DEFENDANT: I understand, your Honor.

THE COURT: And I am just not doing that to his parents. I am not doing it.

THE DEFENDANT: I understand.

THE COURT: So, Mr. Berger, I am willing to keep working with you, but we need a little more support.

MS. MOTTA: And, your Honor, not an attempt to change your opinion at all, I just want to make sure -- because I wasn't sure I made clear on the record, as far as the report -- but the charges pending in Rolling Meadows stem from the exact same incident and occurrence. That is evident.

THE COURT: Yes.

Those will be dismissed, won't they?

MS. KLAMANN: I would imagine, your Honor.

THE COURT: Yes, I would, too.

And I also want to make clear that he did get -- I read the docket sheet and he did get -- my reading of it is he did get permission to travel. So, I am not finding him as, you know, he went out of state without permission.

I do find his lifestyle is totally a disaster, in terms of risk of flight. Just in terms of really no job, no address. No -- you know.

But I think we could -- if we felt comfortable we could -- find that he could live with his parents.

I find his dad completely stable. And I don't see anything wrong with that situation.

I have not heard anything from the government that, "Oh, the dad is encouraging of this," or, "The dad is a problem. The parents are a problem."

But I understand your feeling that they are not particularly close.

I think that is -- I am getting a little bit different read on that than I think there was a lot more reluctance at the first hearing.

I felt less reluctance at today's hearing.

MS. KLAMANN: I think that is right, your Honor.

The government's concern is also based on statements made to Pretrial Services by defendant's girlfriend, that they were, in fact, estranged -- the defendant and his father.

And that was supported by statements from defendant's father at the first detention hearing, that if he wanted to get in contact with defendant, he would call his girlfriend.

THE COURT: Right.

So, I mean, I think that his -- I think that his -- life has not -- his living hasn't lent itself to a finding that he is a risk of flight. I mean, there is not stability there, but I think we can work with that.

But all I am saying is I am detaining him -- and I will write out an order -- that I want us to check in on it every six months. Okay?

And I want you to kind of drill down on what is really happening in this case. Because if it takes a couple of years to get this to trial -- which maybe it won't. I don't know what Durkin is looking like. You know, he may say, "We are going to trial on this in December."

But if we are -- if we are -- if he is really backed

up, I want to be on top of this because he does have a presumption of innocence. And I want him to be able to prepare for his case.

And he does have very solid parents.

Their lives are completely -- you know, they have lived in the same apartment forever. They are completely solid people.

I mean, I might order them to not have the TV on, because I don't think we need agitation.

MS. MOTTA: And, your Honor, you said six months to review? Because earlier you mentioned, like, ninety days.

THE COURT: Yeah.

Well, why don't we have a review in ninety days.

MS. MOTTA: And --

THE COURT: But I have got to go talk to Gilbert about whether that is going to be him or me.

MS. MOTTA: Okay.

And the defendant is going to make a speedy -- is making a speedy -- trial demand.

But if, in fact, the situation changes, as far as setting up some, you know, doctors' appointments, setting up some sort of mental health treatment, then, obviously, we could raise that to the Court --

THE COURT: Of course.

MS. MOTTA: -- I am assuming?

THE COURT: Of course.

I mean, you can always move for bond.

MS. MOTTA: Right.

THE COURT: You can move for bond on Monday.

MS. MOTTA: Right.

THE COURT: Okay?

MS. MOTTA: Thank you, your Honor.

MS. KLAMANN: Thank you, your Honor.

* * * * *

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter, to the best of my ability, given the limitations of using a digital-recording system.

/s/ Joene Hanhardt July 23, 2019
Transcriber